ROCKEFELLER v. WEDGE.

(Circuit Court of Appeals, Third Circuit. December 11, 1906.)

No. 43.

1. TRIAL—VERDICT—JURY—INTERROGATION.

Where several issues are submitted to a jury and a general verdict returned, the court may interrogate the jurors to specialize the verdict and state on which issue or issues it is based.

2. APPEAL—REVIEW—HARMLESS ERROR—SUBMISSION OF ISSUES—PREJUDICE.

Where, in an action on a note, the jury found in plaintiff's favor on an issue as to alleged misrepresentations, plaintiffs sustained no injury by the submission of such issue to the jury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, § 4212.]

3. BILLS AND NOTES—RELEASE—CONSIDERATION.

The defendant, having a good position with the Standard Oil Company, at Bayonne, N. J., was induced by the plaintiff to undertake the management of a zinc mine for him in Missouri, in which the plaintiff was largely interested, being promised a salary of $7,500 and an interest in the mining company, for which he gave plaintiff the note in suit for $15,050, with the stock of the company as collateral. The plaintiff being also interested in a cattle company at Kansas City, and its affairs becoming involved, and a receiver being necessary, the defendant subsequently at his request accepted the position and performed its duties for a number of months, being put under great mental and physical strain in consequence, and also subjected to possible pecuniary liability on his bond, by which he might lose all his property. Wishing to give up the position, he was urged by the plaintiff as a personal favor to continue, which he did. Later on there was a crisis in the affairs of the cattle company, and a large sum of money was necessary to enable the plaintiff, who had guaranteed some $2,000,000 of its obligations, to maintain himself, which money the defendant secured by a personal appeal to the plaintiff's brother, who was a man of affluence in New York. Feeling, however, that his position was insecure, the defendant while on this trip obtained another, at a good salary, with a company in Pittsburg; but upon his return, at the earnest solicitation of the plaintiff and his counsel, was led to give it up and keep on with the cattle company, the plaintiff guarantying and paying the salary which had been promised him from the mining company, but which had been stopped, to which payment, however, the defendant contributed the compensation allowed him by the court as receiver, amounting to $3,800. A few months later the zinc mine was sold at a serious loss; the defendant's interest being made practically worthless. About this time, in a casual interview in a street car, the plaintiff, who had several times before expressed his willingness to give up the defendant's note, saying that he did not wish him to lose anything by the venture, declared to the defendant that he might consider the note discharged; the services which he had rendered to the plaintiff and the sacrifices that he had made to do so being referred to and assigned as the reason. The note, however, was not given up, the plaintiff explaining that it might prejudice him with others, whose notes for similar interests he held and whom he proposed to sue. *Held*, in a subsequent suit by the plaintiff on the note, that there was sufficient consideration for the promise to release, which was set up, and that a verdict for the defendant should be sustained.

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

Francis Rawle and B. P. Finley, for plaintiff in error.

Charles B. Downs and W. Findlay Brown, for defendant in error.

Before DALLAS and GRAY, Circuit Judges, and ARCHBALD, District Judge.

ARCHBALD, District Judge. This was a suit on a promissory note for $15,050, given by the defendant to the plaintiff for an interest in a zinc mining company. The defense set up was, first, that the note was obtained by misrepresentation, and, second, that before it became due the plaintiff agreed to cancel it. Both issues were submitted to the jury, who found for the defendant; but in response to an inquiry by the court, at the time the verdict was rendered, it was put entirely upon the second ground.

Complaint is made that there was no evidence of misrepresentation, and that it was error to let that question go to the jury; the plaintiff

being prejudiced, even though they found in his favor. The practice of calling on jurors to specialize their verdict in the way that was done is furthermore deprecated, and the right of the court to do so is challenged. But the right to interrogate a jury, and to act upon their findings, is directly sustained in Walker v. Southern Pacific R. R., 165 U. S. 593, 597, 17 Sup. Ct. 421, 41 L. Ed. 837, and City of Elizabeth v. Fitzgerald, 114 Fed. 547, 52 C. C. A. 321, and does not need to be vindicated here. And, far from being open to the criticism made of it, if it were oftener resorted to, it would save not a few mistrials; many rulings to which objection could otherwise be justly made being eliminated and rendered harmless. Clementsen on Special Verdicts, 95, 286; 4 Mich. Law Rev. 493. While, then, in the present instance it may have been error to submit to the jury the question of misrepresentation in obtaining the note, and as matters go in the jury room it may, perhaps, not have helped the plaintiff to do so, in legal contemplation it did him no injury; and, the jury having found in his favor upon that issue, it is out of the case as completely as if it never had been there.

The real question is whether there was any consideration for the promise to release the note, which is relied upon. The facts which bear upon this are not seriously disputed. In November, 1900, the plaintiff, having taken an option on a zinc mine in Missouri which he proposed to develop, wrote to the defendant, who was in the employ of the Standard Oil Company at Bayonne, N. J., and had had considerable general business experience, to come out and take charge of it, offering him a salary of $7,500 per annum, where he was getting but $6,000, as well as a substantial interest in the enterprise, for which he agreed to take a three-year note, with the stock of the company which was to be formed as collateral. The relations of the parties for a number of years had been of the most friendly and intimate character, very much, indeed, like that of father and son; the defendant, who started as a stenographer, having risen by the plaintiff's influence to a responsible and remunerative position. Moved by a sense of personal obligation, as well as by the inducements held out to him, the defendant accordingly gave up his place in the East and assumed the management of the business. The venture, however, was not a success, and the defendant was only a short time engaged with it, at least directly. The plaintiff became involved in other matters, in which he needed his assistance, and the active management of it was therefore given up after a few months; the property being eventually sold out to other parties in December following at a heavy sacrifice. The diversion from the mining business was due to a crisis in the affairs of a cattle company at Kansas City, in which the plaintiff was even more largely interested. A receivership was necessary to extricate it, and, the plaintiff having no confidence in those with whom he was associated, the position was pressed upon the defendant, who assumed it in May, 1901, continuing in it up to the middle of October. The duties which devolved upon him in that connection were of the most arduous and exacting character, and, combined with the personal loss entailed by the failure of the zinc mine, the strain upon him, physically and mentally, was so great that early in July he

almost reached the point of a nervous breakdown. His salary from the mine was also cut off, and the prospect of getting anything out of the receivership was problematical, and would not in any event be realized until it was brought to an end. Money to run the cattle business, moreover, was lacking, and he was falling behind in his accounts to such an extent that liability on his bond was possible, imperiling all his property. The situation seemed desperate, and he wrote the plaintiff to be relieved from it, but was urged tô stay on, which he consented to do as a matter of personal favor. No material improvement, however, followed, at least not immediately; and the affairs of the cattle company reached such a crisis in September that, unless relief was speedily obtained, the plaintiff, who had guarantied some $2,000,000 of its obligations, might not be able to maintain himself. The immediate amount needed to tide things over was $86,000, and the defendant suggested that the plaintiff's brothers, William and John D. Rockefeller, men of the largest affluence, should be appealed to. The trouble was that the plaintiff was not on good terms with them, and in addition was himself under such a nervous strain from this and other matters that he was in no condition to go and see them. It was accordingly arranged that, armed with a letter from the plaintiff, the defendant should go to New York and interview Mr. William Rockefeller, which he did with such success that the money was raised and the plaintiff relieved from his embarrassment. Feeling, however, that the situation still was precarious, and that he must look after his own personal interests, the defendant, while away, hunted up and secured a position with a salt company at Pittsburg at a good salary, and upon his return to Kansas City again brought up the question of giving up the receivership. But the plaintiff would not hear to it, and, together with his attorney, labored with the defendant the better part of a day, urging the necessity for his keeping on and the unfairness of his quitting at that time; and, upon the plaintiff promising to take care of the salary due him from the mining company, he agreed to stay, which he did, without further demur, until the receivership was wound up, assisting somewhat, also, again in the management of the zinc company. Not long after this, an offer was made for the zinc property which all parties regarded favorably; the plaintiff being repaid by the sale the cash advances which he had made, and about 10 per cent. being divided around upon the capital, the defendant getting a credit on his note of some $1,500.

This sale was consummated early in December, and soon afterwards, December 17th, while plaintiff and defendant were riding together in a street car, the interview occurred at which, according to the defendant, the note was forgiven him. "You may regard this note as canceled and off the books" is the way it was put; the plaintiff at the same time explaining that he did not surrender it, because he intended to sue certain other parties, who had got him into the enterprise, whose notes for stock he was similarly carrying, and he did not wish to prejudice this. "But your matter," as the defendant was assured, "you may consider disposed of." The plaintiff admits this meeting, and that the subject of the note was brought up, but denies having agreed to release it, and, on the contrary, declares that the defendant wanted him

to do so, but he refused. At least twice before, however, he had voluntarily made a similar offer, and, while the defendant in each case put it aside at the time, only a few days previously he had written to the plaintiff, expressing a willingness to accept, if he thought proper to renew it, which not unnaturally led up to what is claimed to have followed. Right afterwards, also, December 20th, the defendant wrote again, alluding to the point made by the plaintiff about retaining the note, but calling attention to the fact that the matter would be left in bad shape in case either of them died, and suggesting that something should be given to him to show that the note was eventually to be delivered up or canceled. And, while it is true that the plaintiff did not answer favorably, that does not do away with the corroborative effect of this letter. All this, however, goes only to the probability of the defendant's story, and was for the jury. The question which concerns us now is, whether, assuming the promise, there was anything to stand as a consideration so as to make it binding.

As a mere gratuity, if that was all there was to it—the plaintiff not wishing the defendant to be at a loss, as he expressed it, in the earlier offers—the promise to release would not be enforceable; the gift not having been completed by a surrender. The same is true, also, if the stock which was pledged for the note and was demonstrably worthless, was to be taken and the note canceled, which would be merely another way of putting it. Neither was anything done or omitted by the defendant at the time, so as to furnish an inducement directly moving between the parties, although that is not essential; a past transaction being sufficient, provided it actually enters into the bargain. A consideration, however, is claimed to be found in the services rendered by the defendant, to which reference has been made above, which, fortunately for that contention, according to the testimony of the defendant, were expressly assigned by the plaintiff as the basis of his action. "He said he appreciated very much all I had done for him in connection with the receivership matter," is the statement. "He appreciated the heavy strain on my vitality and strength it had been to go through such an experience, and he appreciated what I had done for him in relation to his brother William and other things that I had done; and for these reasons, and all reasons, I might consider that the note was finally disposed of." As to the character and value of these services there can be no reasonable question; nor that they were performed at the urgent solicitation of the plaintiff, for his own personal benefit, and to the marked inconvenience, if not disadvantage, of the defendant.

It is said, however, that they were fully compensated at the time by the salary which he was to get, which was continued to be paid him, as guarantied by the plaintiff, even after the zinc company had gone out of business. But one of the inducements held out to him to leave his position with the Standard Oil Company was that he was to have an interest in the enterprise, which having failed, his salary did not altogether meet the situation. To its payment, moreover, the defendant himself contributed the $3,800, which he was allowed by the court for his services as receiver, which he turned over, at the suggestion of the plaintiff, to help reimburse the latter for the money advanced to the zinc company, out of which the plaintiff's salary was paid; as

the result of which, if his services to the company are held to have been met by his salary, it still leaves him uncompensated for what he did as receiver; and, while it may be that the plaintiff, having personally guarantied his salary, was entitled to command his time in the one position or the other, as it suited him, and even though we disregard the contribution to this which the defendant made by giving up what the court had allowed him, which, after all, goes a long way to eliminate it, outside of and beyond all this there were other and extraordinary services which made up a considerable tale, for which he admittedly got nothing. It was no part of his duty as receiver, for instance, to solicit the $86,000 which was secured from the plaintiff's brother. This was undertaken solely in the interest and for the benefit of the plaintiff, to whom it was of the most supreme importance, the personal character of which he recognized by paying the defendant's expenses, and, if so, why not, also, for his services? And when, at the urgency of the plaintiff and his counsel, the defendant agreed to stay on in the receivership, giving up the position which he had secured elsewhere, it was as a sheer matter of favor to the plaintiff, and was in fact so pressed upon him.

The only difficulty is that the acts of the defendant were apparently rendered without expectation of reward, for which neither then nor afterwards was any direct claim ever made. At the same time, they were in no sense voluntary, in view of which, and the assurances given by the plaintiff from time to time, particularly with regard to the note in controversy, the defendant might fairly anticipate that in some way they would eventually be made up to him. It is in the light of and with reference to all this that the promise to release is to be taken. Fifteen thousand dollars is not given away for nothing, nor is it to be explained in the present instance on the score of friendship, particularly as the plaintiff's regard, as he himself says, had begun to decidedly weaken. Based squarely, as it was by the express declaration of the plaintiff, on the extraordinary services which the defendant had rendered, it thus became at the same time a recognition of their value and of the obligation resting upon him to make compensation, an admission which put the defendant in a position to demand something substantial, even if the release set up were not supportable. It was not simply, as before, that the plaintiff did not want to see the defendant lose by the venture. That, also, may have actuated him. But what he proposed, as it was put, was to positively and directly remunerate him, according to what was acknowledged to be his actual due. Conceding, then, as we must, that a consideration for the promise to release, which is relied upon, must appear, and that consisting, as it did, of services already rendered, they must have been of such a character and performed under such circumstances as entitled the defendant, not only to expect, but to enforce, compensation, there is enough, in our judgment, to meet these requirements in what is found here. It may seem dangerous to hold, as we thus apparently do, that a money obligation of this magnitude can be discharged by a casual observation in an informal interview, without anything directly moving between the parties at the time, and with nothing but the say-so of the party released to sustain it. This is not, indeed, the whole case. But, giving full force to the circumstances

which are thus alluded to, they bear, as already stated, merely on the probabilities, and not on the legal principle involved, with which we are alone concerned at this time, which having been correctly declared at the trial, the judgment is affirmed.