507 F.2d 308
 88 L.R.R.M. (BNA) 2451
 Stafford MILLER, Plaintiff-Appellant,
v.
C.W. DAVIS et al., Defendants-Appellees.
Estill HALL, Plaintiff-Appellant,
v.
C.W. DAVIS et al., Defendants-Appellees.
Clay D. SELLERS, Plaintiff-Appellant,
v.
C.W. DAVIS et al., Defendants-Appellees.
Herbert BARGER, Floyd White, and all other persons
similiarly affected, Plaintiffs-Appellants,
v.
C.W. DAVIS et al., Defendants-Appellees.
 Nos. 73-2009 to 73-2012.
 United States Court of Appeals, Sixth Circuit.
 Nov. 26, 1974.
 
 John W. Collis, Anggelis & Vimont, Lexington, Ky., for plaintiffs-appellants.
 H. B. Noble, Hazard, Ky., Joseph T. McFadden, Washington, D.C., M. E. Boiarsky, Charleston, W. Va., for defendants-appellees.
 Before CELEBREZZE and MCCREE, Circuit Judges, and WALINSKI, District Judge.*
 CELEBREZZE, Circuit Judge.
 
 
 1
 The question in these consolidated appeals is whether a federal court sitting in Kentucky has subject-matter jurisdiction over suits by Kentucky residents for pension benefits allegedly wrongfully withheld by the Trustees of the United Mine Workers of America Welfare and Retirement Fund (hereafter 'the Fund'). The District Court dismissed the complaints on the ground that Kentucky law would not permit them to be brought in a Kentucky state court and that it was bound to follow this Kentucky rule.[1]
 
 
 2
 We reverse the District Court's dismissal of Appellants' complaints. Even assuming that Kentucky law bars a Kentucky state court's jurisdiction over these claims, a question we do not reach,[2] a federal court is not foreclosed from adjudicating them.
 
 
 3
 Before discussing this conclusion, we face a question which was not considered by the parties or the District Court. Appellants asserted jurisdiction under 29 U.S.C. 185(c). This provision merely describes where labor organizations may be sued and does not establish subject matter jurisdiction over claims of improper administration of union trust funds. Nor do Appellants cite a statute which makes federal law the test of Appellant's claims. See Giordani v. Hoffmann, 295 F.Supp. 463, 469-470 (E.D.Pa.1969); Employing Plasterers' Ass'n v. Journeymen Plasterers' Local 5, 279 F.2d 92 (7th Cir. 1960); Rittenberry v. Lewis, 222 F.Supp. 717, 721 n. 2 (E.D.Tenn.1963), aff'd, 333 F.2d 573 (6th Cir. 1964); Palnau v. Detroit Edison Co., 301 F.2d 702 (6th Cir. 1962).
 
 
 4
 It appears, however, that jurisdiction could have been alleged under 28 U.S.C. 1332 (1966), the diversity of citizenship provision. Appellants are most probably citizens of Kentucky (since they are 'residents' of Kentucky), Appellees are not Kentucky citizens, and the Fund is situated in the District of Columbia. Under 28 U.S.C. 1653 (1966) 'Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts.' Amendment to establish jurisdiction is broadly permitted, so as to effectuate Congress' intent in enacting 1653-- to avoid dismissals on technical grounds. Blanchard v. Terry & Wright, Inc., 218 F.Supp. 910 (W.D.Ky.), aff'd, 331 F.2d 467 (6th Cir. 1963), cert. denied, 379 U.S. 831, 85 S.Ct. 62, 13 L.Ed.2d 40 (1964). While we proceed to the merits of this appeal, Appellants must file, within ten days of this decision, a proper amendment in this Court alleging diversity jurisdiction. If appellants fail to do so, the case will be placed on the rehearing docket, and the question of jurisdiction will be reconsidered. See Kaufman v. Western Union Telegraph Co., 224 F.2d 723 (5th Cir. 1955). Should the allegations of $10,000 in controversy prove defective on remand, the District Court will be free to dismiss the complaints.
 
 
 5
 Since jurisdiction is based solely on diversity of citizenship, Kentucky conflict of laws rules determine what substantive law governs the merits of Appellants' claims. Klaxon Co. v. Stentor Electric Mfg. Co., Inc.,313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). It is undisputed that the law which Kentucky courts would apply to determine the merits of these claims is that of the District of Columbia, under whose jurisdiction the Fund is administered.[3] Wilder v. United Mine Workers Welfare and Retirement Fund, 346 S.W.2d 27 (Ky. 1961).
 
 
 6
 The District Court went beyond application of Kentucky's conflict rules in its holding. Applying the decision of the Kentucky Court of Appeals in Wilder, the District Court determined that 'Kentucky courts have no jurisdiction to entertain an action concerning a trust with a situs outside the Commonwealth,' and that it consequently had no jurisdiction over these cases. Thus, the District Court held that its very jurisdiction as a federal court was circumscribed by Kentucky law.
 
 
 7
 This conclusion has serious implications concerning the power of the federal judiciary and the relationship of state and federal law. We feel it important to treat the issue in depth, despite the lack of argument from counsel on this point.
 
 
 8
 The Rules of Decision Act, 28 U.S.C. 1652 (1966) states:
 
 
 9
 The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply.
 
 
 10
 Under this statute a federal court must apply state law in deciding the merits of a diversity case.
 
 
 11
 Until the Supreme Court's decision in Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), it was hornbook law that the jurisdiction of the federal courts depended entirely on the Constitution and acts of Congress and that state law could not limit the federal judicial power. See David Lupton's Sons Co. v. Automobile Club of America, 225 U.S. 489, 32 S.Ct. 711, 56 L.Ed. 1177 (1912); Barrow Steamship Co. v. Kane, 170 U.S. 100, 18 S.Ct. 526, 42 L.Ed. 964 (1898); Chicago & N.W. Ry. v. Whitton, 80 U.S. (13 Wall.) 270, 20 L.Ed. 571 (1871); Union Bank v. Vaiden, 59 U.S. (18 How.) 503, 15 L.Ed. 472 (1855); Suydam v. Broadnax, 39 U.S. (14 Pet.) 67, 10 L.Ed. 357 (1840); Dobie, Federal Jurisdiction and Procedure 336 (1928).[4]
 
 
 12
 With the advent of Erie, a wholesale re-evaluation of the interrelationship of federal and state law began. Erie itself simply extended the Rules of Decision Act to state judge-made law, so that a federal court was required to apply state law as pronounced not only by legislatures but also by state judges.
 
 
 13
 It soon became clear that Erie was much more than a holding, as the 'Erie doctrine' became a broad principle governing the distribution of federal and state law-making power. In Guaranty Trust Co. v. York, 326 U.S. 99, 109, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079 (1945), the Supreme Court announced that
 
 
 14
 the intent of (Erie) was to ensure that, in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a state court . . . a block away.
 
 
 15
 Two years later, the Supreme Court faced a problem somewhat similar to that before us. In Angel v. Bullington, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947), a North Carolina statute forbade deficiency judgments on contracts for the purchase of real estate. When, Bullington, the Virginia vendor, sued Angel, the North Carolina purchaser, in a North Carolina state court to collect the deficiency on the purchase contract (which had not been satisfied through sale of the foreclosed-upon land) the North Carolina Supreme Court held that the statute ousted the state courts from jurisdiction over the complaint. 220 N.C. 18, 16 S.E.2d 411 (1941). The vendor then sued in a North Carolina federal court, under diversity of citizenship jurisdiction. The United States Supreme Court held that the state jurisdictional Court held that the state jurisdictional bar applied to the North Carolina federal court sitting in diversity, both because of the former adverse adjudication in the state court and because of the premise that such state statutes should be given effect in federal court.
 
 
 16
 In Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949), decided the same day as Ragan v. Merchants Transfer Co., 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 1520 (1949), and Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) (with only four Justices joining in all three decisions), the Supreme Court required a federal court to apply a Mississippi statute which provided that a foreign corporation doing business in Mississippi could not bring suit in a Mississippi court unless it had designated in writing an agent for service of process in that state. The majority opinion cited Angel for the proposition that 'the policy of Erie R. Co. v. Tompkins precluded maintenance in the federal court in diversity cases of suits to which the State had closed its courts.' 337 U.S. at 537, 69 S.Ct. at 1237.
 
 
 17
 We believe that a broad 'outcome-determinative' test derived from York, Angel, and Woods would bar federal jurisdiction over these claims. Indeed, our Circuit applied this view of Erie in Atkins v. Schmutz Mfg. Co., 372 F.2d 762 (6th Cir. 1967), and Still v. Rossville Crushed Stone Co., 370 F.2d 324 (6th Cir. 1966).
 
 
 18
 York, however, is not the Supreme Court's final word on 'the policy of Erie.' In Byrd v. Blue Ridge Rural Electric Cooperative, Inc., 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), the Supreme Court held that a federal court sitting in diversity should grant a jury trial on a crucial issue of fact which the state court would have determined without a jury.[5] The Court limited York by holding that although application of a state rule would by required of federal courts in diversity cases when the rule is 'bound up with (the) rights and obligations' at issue, federal courts need not adopt state procedural rules which did not have substantive import and which conflicted with countervailing federal interests.
 
 
 19
 The policy of uniform enforcement of state-created rights and obligations . . . cannot in every case exact compliance with a state rule-- not bound up with rights and obligations-- which disrupts the federal system of allocating functions between judge and jury. 356 U.S. at 537-538, 78 S.Ct. at 901.
 
 
 20
 Furthermore, Byrd cited the pre-Erie case of Herron v. Southern Pacific Co., 283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857 (1931), for the proposition that 'state laws cannot alter the essential character or function of a federal court.' 283 U.S. at 94, 51 S.Ct. at 384, cited at 356 U.S. at 539, 78 S.Ct. 893. Thus, the Rules of Decision Act was interpreted as mandating strict adherence to state law which had substantive content, but not requiring mimickery of state procedural rules which had little substantive content and were designed primarily for purposes of state judicial administration.
 
 
 21
 This view of the Rules of Decision Act was reiterated in Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). While resting its decision on the Rules Enabling Act, the Supreme Court went out of its way to state that
 
 
 22
 it is doubtful that, even if there were no Federal Rule making it clear that in-hand service is not required in diversity actions, the Erie rule would have obligated the District Court to follow the Massachusetts procedure. 'Outcome-determination' analysis was never intended to serve as a talisman. 380 U.S. at 466-467. 85 S.Ct. at 1141.
 
 
 23
 Thus, the strict 'outcome-determinative' test was laid to rest as the sole criterion for determining when the Rules of Decision Act required application of a state rule by a federal court.[6] The key considerations were two: maintaining uniformity in the interpretation of a state's substantive law (so as to avoid forum-shopping)[7] and preventing the accident of citizenship from unfairly affecting the outcome of a diversity case.
 
 
 24
 In this case two statutes give the District Court jurisdiction and venue over these claims, 28 U.S.C. 1332 and 28 U.S.C. 1391(a). The crux of this case, therefore, is whether the Rules of Decision Act required the District Court to apply the Wilder rule despite these federal statutes.
 
 
 25
 In light of the above analysis, we hold that the following vest determines whether a federal court should apply a state rule when it is senforcing rights created by state law:
 
 
 26
 1. If the state provision is the substantive right or obligation being asserted, the federal court must apply it.[8]
 
 
 27
 2. If the state provision is a procedural rule which is intimately bound up with the substantive right or obligation being asserted, the federal court must apply it.[9]
 
 
 28
 3. If the state provision is a procedural rule which is not intimately bound up with the substantive right or obligation being asserted, but its application might substantially change the outcome of the litigation, the federal court should determine whether state interests in favor of applying the state rule outweigh countervailing federal considerations against application of the rule. If the state interests predominate, the state rule should be adopted.[10]
 
 
 29
 A substantially similar test was announced in Szantay v. Beech Aircraft Corp., 349 F.2d 60, 63-64 (4th Cir. (1965).[11]
 
 
 30
 Applying this test to the case at hand, we find that Kentucky's Wilder rule is not the substantive right or obligation being asserted. The substantive rights in question are Appellants' entitlement to pension benefits under the terms of the UMW Fund and the laws of the District of Columbia. Where Appellants may sue to enforce their rights is a different question.
 
 
 31
 We cannot say that the Wilder rule is intimately bound up with Appellants' asserted rights to pension benefits. There is no indication in Kitchen v. New York Trust Co., 292 Ky. 706, 168 S.W.2d 5 (1943) or Wilder, 346 S.W.2d 27 (1961), that the policy behind the Kentucky rule is to handicap the ability of trust beneficiaries to enforce their rights. Rather, the judge-made rule of Kitchen and Wilder derives from notions of in personam jurisdiction and choice of law that no longer predominate. Kitchen was a 1943 suit by a settlor attempting to revoke a trust. Since the Kentucky courts had no jurisdiction over the corpus (situated in New York) or over the New York trustee, the Kentucky court would have been unable to enforce an order against the trust company. 168 S.W.2d at 8. Kitchen also relied on and adopted the former 299, Restatement of Conflict of Laws (1934), which was based on the notion that only one court should instruct a trustee as to his obligations, so as to achieve complete uniformity in the administration of a trust of movables. Wilder simply followed this holding.
 
 
 32
 The Wilder rule, then, rests on policies that were not meant to inhibit a beneficiary's ability to enforce his rights. The rule simply requires beneficiaries to travel to the trust's situs to assert their rights. Thus, this case falls outside the reach of such decisions as Angel v. Bullington, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947) (strong state policy against the deficiency judgment sought by plaintiff was expressed through a state court 'door-closing' statute, which was held to require shutting the federal court's doors as well); Cities Service Oil Co. v. Dunlap, 308 U.S. 208, 212, 60 S.Ct. 201, 84 L.Ed. 196 (1939) (state burden of proof rule amounted to 'valuable assurance' in favor of the legal title); Chevron Oil Co. v. Huson, 404 U.S. 97, 103, 92 S.Ct. 349, 354, 30 L.Ed.2d 296 (1971) (state statute of limitations 'is coordinated with the substance of the remedy'); and Atkins v. Schmutz Mfg. Co., 372 F.2d 762 (6th Cir. 1967) (state statute of limitations prevails).[12] See Byrd v. Blue Ridge Rural Electric Cooperative, Inc., 356 U.S. 525, 536, 78 S.Ct. 893, 900, 2 L.Ed.2d 953 (1956), where 'the requirement appears to be merely a form and mode of enforcing the immunity, . . . and not a rule intended to be bound up with the definition of the rights and obligations of the parties.'
 
 
 33
 Under neither of the first two sections of the test set forth above, then, does the Wilder rule control a Kentucky federal court. Under the third section, it is obvious that the District Court's non-application of Wilder would lead to an opposite result from that which Appellants would receive from a Kentucky state court, assuming that Wilder is still the law of Kentucky. Thus, we must ask whether state interests in favor of the rule or countervailing federal considerations predominate.
 
 
 34
 The policies that underlie Kitchen and Wilder, as discussed above, are those of personal jurisdiction, choice of law, and venue.
 
 
 35
 Since the 1961 Wilder decision, the Kentucky legislature passed a long-arm personal jurisdiction statute. See 454.210, Ky.Rev.Stat. (1968).[13] Under this statute it appears that personal jurisdiction over non-resident trustees will often be available.[14] That part of the Kitchen-Wilder rationale which rests on a restrictive view of personal jurisdiction must be revised to account for its present broad availability. This means that the policy against issuing nugatory decisions no longer bears on such claims as those before us. In this respect it infringes no state policy at all for a Kentucky federal court to assert subjectmatter jurisdiction over these cases.
 
 
 36
 That part of the Kitchen-Wilder rationale which rests on notions of choice of law has been seriously undermined by recent developments. The former Restatement view invoked by the Kitchen and Wilder courts (that trusts should be suable only in the courts of the jurisdiction in which they are situated) has been changed so as to favor Kentucky jurisdiction over Appellants' claims. Compare Restatement of Conflict of Laws 299 (1934), with Restatement (Second) of Conflict of Laws 267 (1971). The modern Restatement rule has led to an abandonment of the Wilder view in several jurisdictions,[15] and the Kentucky Court of Appeals might decide to do likewise, in view of its heavy reliance on the earlier Restatement. Indeed, the old Restatement rule has lost much of its justification since other jurisdictions have chosen not to abide by it. The presumed benefit of the old rule is that the courts of each state will be the exclusive forums for actions against trusts situated therein. An inequitable situation arises if Kentucky maintains its bar against suits by Kentucky miners in Kentucky courts to obtain pension benefits from the UMW Fund while miners in Tennessee, Colorado and Pennsylvania, among other states are able to sue trustees of Kentucky trusts in their home courts. Kentucky would be adhering to a system that handicaps its own residents while not preventing out-of-state beneficiaries of Kentuckysituated trusts from suing in the beneficiaries' home courts. Of course, Kentucky is free to come to its own conclusion as to whether Kentucky state courts should be open to Appellants. It is sufficient for our purpose to conclude that the Wilder rule does not represent a policy against convenient suits by Kentucky pensioners, in light of the erosion of support for the old Restatement rule.[16]
 
 
 37
 Finally, insofar as Kitchen and Wilder rest on considerations of venue, including the doctrine of forum non conveniens,[17] this is considered a 'procedural' matter within the policy of Erie. State law does not control the venue of federal courts. Steel Motor Service v. Zalke, 212 F.2d 856, 858 (6th Cir. 1954); McCoy v. Siler, 205 F.2d 498 (3rd Cir.), cert. denied, 346 U.S. 872, 74 S.Ct. 120, 98 L.Ed. 380 (1953). See 1 J. Moore, Federal Practice 1322 (1974).
 
 
 38
 Just as the state policies against a federal court's exercise of subject-matter jurisdiction over these claims are weak, if existent, the federal interests in favor of its exercise are strong.
 
 
 39
 One federal interest to be served by having the Kentucky federal courts take subject-matter jurisdiction is embodied in the grant of diversity jurisdiction itself. By conferring jurisdiction on the federal courts in diversity cases through 28 U.S.C. 1332, Congress intended a uniformly administered federal judicial system, which affords litigants of diverse citizenship convenient forums in which to vindicate their rights. Although the basic Congressional purpose behind the grant of diversity jurisdiction was to protect out-of-state suitors from the prejudice of state courts, see The Federalist No. 80 (Hamilton); Erie R.R. v. Tompkins, 304 U.S. 64, 74, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the Congressional purpose was broader. By vesting the federal district courts with equity jurisdiction and guaranteeing adequate appeals within the federal judicial system, Congress afforded procedures and remedies that were not available in the courts of several states.[18] There is historical evidence that apart from the fear of local bias, Congress intended to open the federal courts to litigants of state claims who would not have received an adequate reception in state courts. More importantly, the Supreme Court has held,
 
 
 40
 The diversity jurisdiction was not conferred for the benefit of the federal courts or to serve their convenience. Its purpose was generally to afford to suitors an opportunity in such cases, at their option, to assert their rights in the federal rather than in the state courts.
 
 
 41
 Meredith v. Winter Haven, 320 U.S. 228, 234, 64 S.Ct. 7, 11, 88 L.Ed. 9 (1943). See also First Nat'l Bank v. United Air Lines, 342 U.S. 396, 399-400, 72 S.Ct. 421, 96 L.Ed. 441 (Jackson, J., concurring). As Judge Brown stated in Monarch Ins. Co. v. Spach, 281 F.2d 401, 407 (5th Cir. 1960),
 
 
 42
 'A United States District Court clothed with power by Congress pursuant to the Constitution is not a mere adjunct to a state's judicial machinery. In entertaining diversity cases it is responding to a constitutional demand made effective by congressional action and, as the recent abstention cases have made so clear, it has a constitutional duty to hear and adjudicate.'
 
 
 43
 See also Sayers v. Forsyth Building Corp., 417 F.2d 65, 73 (5th Cir. 1969); In re President and Fellows of Harvard College, 149 F.2d 69, 72-73 (1st Cir. 1945).
 
 
 44
 In short, there is a federal interest in having federal courts adjudicate all cases properly brought under a jurisdictional grant from Congress.[19] This interest is particularly strong where the beneficiaries of a hugh, nationwide pension fund are involved.
 
 
 45
 A second federal interest is the uniform application of the federal venue statutes. Under 28 U.S.C. 1391(a),
 
 
 46
 A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in the judicial district where all plaintiffs or all defendants reside, or in which the claim arose.
 
 
 47
 Kentucky is Appellants' residence, so that the federal statute gives the Kentucky federal courts venue to adjudicate these claims. Heeding federal venue provisions despite a conflicting state doorclosing rule is appropriate when the state rule itself stems from venue considerations rather than substantive state policies. As noted above, supra n. 17, the former Restatement view which the Kentucky Court of Appeals adopted in Kitchen and Wilder rested largely on venue considerations. Federal courts should apply federal venue rules and need not follow contrary state law. Steel Motor Service v. Zalke, 212 F.2d 856, 858 (6th Cir. 1954).
 
 
 48
 A third federal interest is the need for uniform administration of a trust of nationwide scope such as the UMW Fund, which was Kentucky's policy in adopting the Wilder rule. Since federal courts in Pennsylvania, Colorado, and Tennessee, among other states,[20] entertain similar suits by resident claimants of the UMW Fund, Kentucky claimants would be disadvantaged if they were unable to sue in Kentucky. As stated in Rittenberry v. Lewis:
 
 
 49
 When a trust seeks to operate upon a nationwide basis, as does the Welfare Fund here, with 1,500,000 beneficiaries scattered across the nation, it is difficult to understand how a rule of convenience in the law of administration of trusts could so dominate the judicial mind as to cause it to disregard the rights and convenience of 1,500,000 beneficiaries across the nation in favor of a rule that accords a theoretical uniformity of instruction to the trustee. Under such a rule the Fund could locate in Hawaii, where presumably no miners live, and for all practical purposes escape any court supervision of the rights of the beneficiaries. To a destitute and disabled miner in Tennessee, Washington, D.C. can be about equally as unavailable as Hawaii. 222 F.Supp. at 721-722.
 
 
 50
 We would be encouraging the inequitable administration of the UMW Fund were we to block a Kentucky claimant's access to a convenient federal court while the federal courts are open to claimants in other states. There is a substantial federal interest in ensuring that beneficiaries of a nationwide fund such as the UMW's have equal access to the judicial process. Otherwise, retired miners in some states will be effectively foreclosed from enforcing their pension rights while others will not be so handicapped. The federal interest, furthermore, is especially strong when the defendant trust is subject to federal regulation which expresses a national interest in its fair administration. See 29 U.S.C. 186(c). In order that the Fund be administered equitably, by ensuring that its beneficiaries have equally effective access to a convenient judicial forum, the federal courts should be open to all litigants within their statutorily granted jurisdiction.
 
 
 51
 In view of the federal interest favoring subject-matter jurisdiction and the minimal-- if existent-- state policy disfavoring it, we conclude that the Rules of Decision Act does not require the District Court to decline jurisdiction over these cases.
 
 
 52
 Since Kentucky's Wilder rule should not be applied by the District Court, a final question is whether there is any basis in federal law to warrant a dismissal of these suits. Upon a sufficient allegation of diversity jurisdiction, Appellants will have vested subject-matter jurisdiction in the District Court. Whether Appellees can establish that federal rules require the dismissal or transfer of the claims to another district, e.g., under 28 U.S.C. 1404, and whether Appellees are subject to personal jurisdiction in Kentucky under 454.210, Ky.Rev.Stat., are questions not presently before us.
 
 
 53
 The District Court's dismissal of Appellants' claims is revered, and the causes are remanded for further proceedings consistent with this opinion.
 
 
 54
 McCREE, Circuit Judge (concurring).
 
 
 55
 I concur because the only issue presented in this appeal is whether a Kentucky court would have assumed jurisdiction of this case if it had been instituted in a state court; and I believe that the Kentucky Court of Appeals, which, in wilder v. United Mine Workers Welfare and Retirement Fund, 346 S.W.2d 27 (Ky.1961), followed Hobbs v. Lewis, 197 Tenn. 44, 270 S.W.2d 352 (1954), in upholding the refusal of a Kentucky trial court to assume jurisdiction of an aciton brought by one of its residents against a fund not located within its boundaries, would, in light of the recent enactment of a Kentucky 'long-arm' statute, decide the issue presented here as we determined Tennessee would after enacting its 'long-arm' statute. See Rittenberry v. Lewis, 333 F.2d 573 (6th Cir. 1964), where we held that because of Tennessee's enactment of a 'long-arm' statute, its courts would assume jurisdiction of an action brought by one of its residents against the United Mine Workers fund not located in that state.
 
 
 
 *
 The Honorable Nicholas J. Walinski, Judge, United States District Court for the Northern District of Ohio, sitting by designation
 
 
 [1]
 Memorandum Opinion and Order, Civil Nos. 1606, 1607, 1669, 1670 (E.D.Tenn. July 12, 1973); on motion to reconsider, Memorandum Opinion and Order (July 23, 1973)
 
 
 [2]
 Our discussion below concerning the erosion of state policy against a non-resident trust's amenability to suit in Kentucky should not be taken as a determination that Kentucky law has abandoned the Wilder decision, on which the District Court relied. See Wilder v. United Mine Workers Welfare Retirement Fund, 346 S.W.2d 27 (Ky.1961). That, of course, is a decision which only the Kentucky state courts or legislature can make
 
 
 [3]
 Although the Fund must comply with certain federal requirements, 29 U.S.C.A. 186(c) (1974 Supp.), 'state authorith remains the legal foundation upon which such funds are constructed.' Snider v. All State Administrators, Inc., 481 F.2d 387, 390 (5th Cir. 1973), reh. denied, 481 F.2d 1403. The state authority governing the obligations of the Fund's trustees is that of the District of Columbia. See e.g., Kiser v. Carey (Moore) v. United Mine Workers of America Welfare and Retirement Fund of 1950), 353 F.Supp. 736 (D.D.C.1973); Haynes v. Lewis, 298 F.Supp. 331 (D.D.C.1969); Sturgill v. Lewis, 125 U.S.App.D.C. 335, 372 F.2d 400 (1966)
 
 
 [4]
 See generally Meador, 'State Law and the Federal Judicial Power,' 49 Va.L.Rev. 1082 (1963)
 
 
 [5]
 See generally Smith, 'Blue Ridge and Beyond: A Byrd's-Eye View of Federalism in Diversity Litigation,' 36 Tul.L.Rev. 443 (1962)
 
 
 [6]
 See generally McCoid, 'Hanna v. Plumer: The Erie Doctrine Changes Shape,' 51 Va.L.Rev. 884 (1965). But cf. Ely, 'The Irrepressible Myth of Erie,' 87 Harv.L.Rev. 693, 717 n. 130 (1974)
 
 
 [7]
 Thus, in a diversity case a state statute of limitations, for instance, must be followed, Hanna, 380 U.S. at 469, 85 S.Ct. 1136, as well as a state rule determining when such an affirmative defense is considered waived, Hayden v. Ford Motor Co., 497 F.2d 1292, (6th Cir. 1974). In both cases the state rules embody important substantive policies that transcend their role in judicial administration. See Ely, 707-18
 
 
 [8]
 Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Hanna v. Plumer, 380 U.S. 460, 471-472, 475, 85 S.Ct. 1136, 14 L.Ed.2d 8 (Harlan, J., concurring) (1965)
 
 
 [9]
 Byrd v. Blue Ridge Rural Electric Cooperative, Inc., 356 U.S. 525, 538, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); Angel v. Bullington, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947)
 
 
 [10]
 Byrd, 356 U.S. at 537-538, 78 S.Ct. 893; Cf. Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949)
 
 
 [11]
 See also Atkins v. Schmutz Mfg. Co., 435 F.2d 527 (4th Cir. 1970) (en banc). Similar reasoning is apparent in cases involving conflicts between state bond requirements and Federal Rules of Civil Procedure 1, 6(b), and 60(b), Johnson Chemical Co. v. Condado Center, Inc., 453 F.2d 1044 (1st Cir. 1972); the relationship of federal admiralty jurisdiction and local interests, Kelly v. Smith, 485 F.2d 520 (5th Cir. 1973) (majority and dissenting opinions); jurisdiction over foreign corporations, Arrowsmith v. United Press Int'l, 320 F.2d 219 (2d Cir. 1963); and the admissibility of evidence in the face of a restrictive state statute, Courtland v. Walston & Co., Inc., 340 F.Supp. 1076 (S.D.N.Y.1972)
 
 
 [12]
 Insofar as our Atkins opinion fails to discuss Supreme Court holdings after York, Angel and Woods, its reach must be confined to the boundaries set forth herein
 
 
 [13]
 Section 454.210, Ky.Rev.Stat., states in part:
 (1) As used in this section, 'person' includes an individual . . . or a corporation, partnership, association, or any other legal of commercial entity, who is a nonresident of this Commonwealth.
 The statute goes on to list various instances in which such 'persons' are subject to personal jurisdiction of the Kentucky courts.
 
 
 [14]
 Whether Appellees are subject to personal jurisdiction in the District Court is a question not presently before us
 
 
 [15]
 See Rittenberry v. Lewis, 222 F.Supp. 717 (E.D.Tenn.1963), aff'd 333 F.2d 573 (6th Cir. 1964); George v. Lewis, 228 F.Supp. 725 (D.Colo.1964), and Myhalyk v. Lewis, 398 Pa. 395, 158 A.2d 305 (1960)
 
 
 [16]
 The case of Still v. Rossville Crushed Stone Co., 370 F.2d 324 (6th Cir. 1966), can be distinguished on this basis. The policy that an action for injury to real estate is 'local' and must be brought only in a court with jurisdiction over the land itself is widely held. This policy has underpinnings of federal law and massive historical support, as the Still Court pointed out through its citations of Livingston v. Jefferson, 15 Fed.Cas. p. 660, 1 Brock. 203 (No. 8,411) (C.C.D.Va.1811), and Ellenwood v. Marietta Chair Co., 158 U.S. 105, 15 S.Ct. 771, 39 L.Ed. 913 (1895)
 
 
 [17]
 The Restatement view which Kitchen and Wilder adopted was largely based on doctrines of venue. See Comment to 299, Restatement of Conflict of Laws (1934); Rittenberry v. Lewis, 222 F.Supp. 717, 721-722 (E.D.Tenn.1963), aff'd, 333 F.2d 573 (6th Cir. 1964)
 
 
 [18]
 See generally P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 18-19, 1051-53 (2d ed. 1973); Hill, 'The Erie Doctrine and the Constitution,' 53 Nw.U.L.Rev. 427, 451-55 (1958); The Federalist No. 81 (Hamilton)
 
 
 [19]
 There are also reasons for a federal court to abstain from exercising its jurisdiction. See, e.g., Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). In these cases, the federal courts had jurisdiction over the claims. The decisions not to adjudicate them in federal court rested on an exercise of discretion based on 'some recognized public policy or defined principle guiding the exercise of the jurisdiction conferred which would in exceptional cases warrant its non-exercise.' Meredith, 320 U.S. at 234, 64 S.Ct. at 11. See Kurland, 'Toward a Co-operative Judicial Federalism: The Federal Court Abstention Doctrine,' 24 F.R.D. 481 (1966)
 
 
 [20]
 See n. 15, supra