**ROSEBUD SIOUX TRIBE OF SOUTH DAKOTA et al., Plaintiffs,**

v.

**Ed DRIVING HAWK et al.,
Defendants.**

Civ. A. No. 75–3031.

United States District Court,
D. South Dakota, C. D.

Jan. 23, 1976.

Mario Gonzalez, Martin, S. D., for plaintiffs.

Dennis H. Hill, Rapid City, S. D., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

This action arises out of a tribal election controversy on the Rosebud Reservation in Rosebud, South Dakota. The Plaintiff, the Rosebud Sioux Tribe of South Dakota, Robert Burnette in his official capacity as President of the Rosebud Sioux Tribe, and five members of the Rosebud Sioux Tribal Election

Board,[1] bring this action for injunctive and declaratory relief to prohibit the defendants, Ed Driving Hawk, Abraham Bordeaux, Sr., John King, Jr., Morris Thompson in his official capacity as Commissioner of Indian Affairs, Harley Zepher in his official capacity as Aberdeen Area Director of the Bureau of Indian Affairs, Simon Stevens in his official capacity as Acting Superintendent of the Rosebud Agency, Pat Yotto in his official capacity as Captain of the Rosebud Sioux Tribal Police Department, and the United States of America, from interfering with or otherwise obstructing the plaintiffs in the performance of their official duties as officers of the Rosebud Sioux Tribe.[2] Two of the defendants, Ed Driving Hawk and John King, Jr., counterclaimed, alleging that the actions of the Rosebud Sioux Tribal Council and its President, Robert Burnette, in conducting an investigation and ordering a new election and the actions of the Trib-

al Election Board in refusing to certify the election and recommending to the Tribal Council that a new election be held (1) deny the counterclaimants their right to vote and to have their vote counted, and their right to hold elective office, (2) violate the By-laws, Ordinances, and Constitution of the Rosebud Sioux Tribe, and (3) deprive the counterclaimants of property and liberty without notice or an opportunity to be heard in violation of their right to due process of law.[3,4] The plaintiffs alleged that jurisdiction over their complaint was vested in the Court under 28 U.S.C. §§ 1331, 1361, and 1362. The counterclaimants allege an independent basis for jurisdiction under 42 U.S.C. §§ 1985–86, 25 U.S.C. §§ 1301–02 (The Indian Civil Rights Act), and 28 U.S.C. § 1343.[5] The plaintiffs, as such and as counterclaim defendants, seeking to return the controversy to the tribal adjudicatory processes now move the Court to dismiss the com-

---

1. Alfred Left Hand Bull, Frank Bear Heels, Louis Leader Charge, Justin White Hat, and Bernard Flood. All were appointed by the Rosebud Sioux Tribal Council under the authority of Tribal Ordinance RB 75–05.

   The Rosebud Sioux Tribe of South Dakota is a federally recognized Indian tribe organized under the provisions of the Indian Reorganization Act of June 18, 1934, c. 576, 48 Stat. 984, 25 U.S.C. § 461 et seq.

2. On October, 23, 1975 defendant Ed Driving Hawk defeated incumbent Robert Burnette for the office of the President in the unofficial results of a general election by a vote of 1109 to 1061. Mr. Driving Hawk, upon ascertaining that he was the apparent winner, held a victory pow-wow on the evening of October 25, 1975. He inappropriately arranged to have himself sworn in as President though the election had not yet been certified, and he began to assume the responsibilities of that office, thereby displacing and precluding Mr. Burnette and the Tribal Election Board from performing the functions of their respective offices. Upon application by the plaintiffs for a temporary restraining order, this Court, on October 27, 1975 restrained and enjoined the defendants from interfering with the plaintiffs in the performance of their duties as officials of the Rosebud Sioux Tribe, and ordered that the ballot boxes be sealed and stored in the Office of the Clerk of Courts, United States District Court, Pierre, South Dakota.

3. Robert Burnette, (President), Alfred Left Hand Bull, Frank Bear Heels, Louis Leader Charge, Justin White Hat, Bernard Flood, (Tribal Election Board), Aloysius Larvie, Jacob Antoine, Richard Lone Dong, Paul Eagle Star, Nelson Stranger Horse, Narcisse Brave, Leo Running Horse, Levi Antonie, George Bear, Donald Knox, James Guerue, Robert Walm, Titus White Lance, Robert Quigley, Jonas Swift, Joe Eyotte, Jr., Leo Chasing in Timber, Charles Kills in Water, Victor Little Thunder, Opie LaPointe, and Julie C. Lambert (Tribal Council) were sued in their official and individual capacities.

4. Under date of November 1, 1975, this Court issued a temporary restraining order restraining and enjoining Robert Burnette and the Rosebud Sioux Tribe from announcing or conducting a re-election for president, vice president, and or council members.

5. The counterclaimants advanced a motion to amend the counterclaim and add their jurisdictional allegation under 28 U.S.C. § 1343, only after the plaintiffs pointed out the defect during their arguments for a dismissal on jurisdictional grounds. Leave to amend will be and is granted however, for the plaintiffs have not been prejudiced by the technical omission. The substance and intent of the counterclaimants' allegations have never been obscured. *Fed.R.Civ.P.* 15(a); 28 U.S.C. § 1653, *See Schlesinger v. Councilman*, 420 U.S. 738, 95

plaint and the counterclaim for a lack of jurisdiction.[6]  Fed.R.Civ.P. 12(b)(3).  The matter has been fully briefed and argued before the Court, all evidence tendered by any of the parties has been received and considered, and the cause is ripe for determination.

In determining whether jurisdiction over the controversy vests in this Court, the allegations of the pleadings, buttressed, if necessary, by facts introduced in evidence, are considered and the burden is always upon a plaintiff to demonstrate that the case is within the cognizance of the Court.  See *KVOS, Inc. v. Associated Press*, 299 U.S. 269, 278, 57 S.Ct. 197, 81 L.Ed. 183 (1936), *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936), *Hedberg v. State Farm Mutual Auto Insurance Company*, 350 F.2d 924, 929 (8th Cir. 1965).  The essence of the original complaint is the allegation that the defendants acted in defiance of the Tribal Constitution and Ordinances governing the election process of the Rosebud Sioux Tribe.  Such matters, involving intra-tribal controversies based on rights allegedly secured by Tribal law, are not properly the concern of the federal courts.  28 U.S.C. § 1361 provides for a mandamus remedy to compel federal officers or employees to perform duties owed the plaintiffs, but, although several federal officers have been named as defendants,[7] the remedy would not be appropriate in the instant case.  An award of mandamus relief directed against the federal officers served in the case would not substantially rectify the alleged violations.  The thrust of the original action is aimed at prevent-ing Mr. Driving Hawk and his supporters, all private parties, from gaining allegedly unlawful control of the Tribal government.  The federal officials in the suit are allegedly participants in a general scheme to insert Mr. Driving Hawk in the Presidency of the Rosebud Sioux Tribe.[8]  Although federal officials may, if it is appropriate, be directed to refrain from interfering with properly enacted Tribal election procedures, such directions would not directly operate to keep Mr. Driving Hawk and his supporters from assuming the reins of the Tribal government.  Mandamus has long been considered an extraordinary remedy to be awarded only in the exercise of sound judicial discretion, see e. g., *Prairie Band of Pottawatomie Tribe of Indians v. Udall*, 355 F.2d 364, 367 (10th Cir. 1966), and the Court finds that it would be inappropriate in the instant case.

It is also alleged, in the primary complaint, that jurisdiction over that complaint is conferred on the Court by 28 U.S.C. §§ 1331, 1362.  Both sections, however, require that the matter in controversy arise "under the Constitution, laws, or treaties of the United States."  While the drafting of the Rosebud Constitution and the functioning of a local Rosebud governing unit is authorized by federal law, see The Indian Reorganization Act of June 18, 1934, c. 576, 48 Stat. 984, *as amended*, 25 U.S.C. § 476, it is designed to provide for virtual self-government of the Rosebud Sioux people.[9]  The Rosebud Constitution, as approved by a vote of the Rosebud people, provides for the election of a president, vice president and Tribal Council.  The Tribal Council, pursuant to its constitutional authority,

---

S.Ct. 1300, 43 L.Ed.2d 591 (1975); *McGovern v. American Airlines, Inc.*, 511 F.2d 653, 654 (5th Cir. 1975); *Miller v. Davis*, 507 F.2d 308, 311 (6th Cir. 1974).

6. The plaintiffs are not willing to voluntarily withdraw their complaint, however.

7. Harley Zepher in his official capacity as Aberdeen Area Director of the Bureau of Indian Affairs; Morris Thompson in his official capacity as Commissioner of Indian Affairs; Simon Stevens, in his official capacity as Acting Superintendent of Rosebud Agency; Pat Yotto in his official capacity as Captain of the Rosebud Sioux Tribal Police Force.

8. It is alleged that several of the federal officers, as employees of the Bureau of Indian Affairs, improperly recognized Mr. Driving Hawk as the new president of the Rosebud Sioux Tribe.

9. The Secretary of the Interior is given general supervisory authority, however.

has promulgated Ordinance No. 75–05 to establish orderly procedures for the nomination and election of candidates to tribal office. The complaint alleges that this and other Tribal laws have been violated by the defendants; no federal law or treaty provision is alleged as directly material to the controversy. Questions of election procedure are properly the concern of the Tribal Courts, the Tribal Council, and ultimately the Rosebud Sioux people who may, by voting, amend the Constitution and elect the Tribal officers. Accordingly, the complaint cannot be said to assert a federal question cognizable under either § 1331 or § 1362. *Cf. Motah v. United States*, 402 F.2d 1, 2 (10th Cir. 1968); *Ware v. Richardson*, 347 F.Supp. 344, 347 (W.D.Okl.1972).

■ The counterclaim, however, contains claims distinguishable from the main complaint, and is supported with independent allegations of jurisdiction under 42 U.S.C. § 1985(3), 25 U.S.C. § 1302 and 28 U.S.C. § 1343. The counterclaiming parties allege, in effect, that the counterclaim defendants, although acting overtly with Tribal procedures, have enforced and are seeking to enforce Tribal ordinances in a manner that effectuate a denial of their right to vote, to have their vote counted, and their right to hold elective office. The United States Court of Appeals for the Eighth Circuit has recently held that 42 U.S.C. § 1985(3), in conjunction with 28 U.S.C. § 1343(4), protects an individual's right to vote in tribal elections against interference from private conspiracies if it can be shown that the conspirators are motivated by an invidiously discriminatory animus toward the claimants because of the claimants' association with an identifiable class. *Means v. Wilson*, 522 F.2d 833, 839 (8th Cir. 1975). The counterclaimants have alleged facts that bring the case, and those individuals sued in their individual capacities within the jurisdiction of this Court. The facts alleged in the counterclaim, as amended, assert that members of the Tribal Election Board and the Tribal Council conspired and performed overt acts in furtherance of a conspiracy to deprive the counterclaimants of their right to vote and hold elective office because they were associated with a rival political faction.[10] The Court in the *Means* case (*supra*) also held that 25 U.S.C. § 1302 will support a claim of intentional interference with the right to vote as against an Indian tribe and its governmental subdivisions, specifically an election board. See *Means v. Wilson, supra*, 522 F.2d 833, at 841. Accordingly, the counterclaimants' allegations that the Tribal Council and the Tribal Election Board are acting to defeat their right to have their votes counted, and their right to hold elective office are cognizable in this Court.

■ Finally, the plaintiffs contend that the counterclaimants have not exhausted their tribal remedies, and that exhaustion is a necessary prerequisite to federal court relief. We need not reach the question of whether exhaustion is a legal requisite to relief under § 1302 and § 1985, however, for, from the evidence adduced, the Court concludes that returning the counterclaimants to their tribal remedies would create an irreparable injustice.

Under the applicable tribal statute, the incoming Tribal Council must make a decision on whether a re-election is appropriate upon recommendation from the Tribal Election Board. Ordinance No. 75 05–24. Furthermore, the Tribal Council is empowered by Tribal Constitution with adjudicative responsibilities. The Tribal Courts are created by and, therefore, serve at the pleasure of the Tribal Council, effectively making the Tribal Council the supreme judicial authority.[11]

---

10. While the counterclaimants are not seeking damages under Section 1985(3), that section has been commonly held to support claims for injunctive relief. *E. g., Action v. Gannon*, 450 F.2d 1227, 1237 (8th Cir. 1971); *Mizell v.* *North Broward Hospital District*, 427 F.2d 468, 473 (5th Cir. 1970).

11. The authority of the Tribal Council was fully borne out in the testimony. It was referred

Rosebud Sioux Tribe Const. Art. IV, Sec. 1, Subsec. (K). The Court notes however that past actions have made a return to tribal procedures inappropriate. First, the existing Tribal Council, in closed session, without having properly notified Mr. Driving Hawk or permitting him to be heard on the matter, adopted Resolution 75–125, publicly and definitively proclaiming that Mr. Driving Hawk and his supporters are culpable of election irregularities. The Ordinance also appointed an inherently biased party, plaintiff Robert Burnette, to act as the investigative authority.[12]

Resolution 75–125 reads in part:

Whereas, Edward Driving Hawk's election to the office of the President of the Rosebud Sioux Tribe has not been certified by the Election Board, and

Whereas, on the evening of October 25, 1975, Judge Abraham Bordeaux, without authority, swore in Edward Driving Hawk as the new President of the Rosebud Sioux Tribe, and

Whereas, Acting Superintendent, Simon S. Stevens, was present when Edward Driving Hawk was sworn in and approved and acknowledged the ceremonies on behalf of the Bureau of Indian Affairs, and

Whereas, Simon S. Stevens, George Keller and Patrick Iyotte, Captain of Police, did aid and abet Edward Driving Hawk and his supporters attempted to overthrow the government of the Rosebud Sioux Tribe beginning Saturday, October 25, 1975, contrary to the Tribal Constitution and Ordinances of the Tribe, and

Whereas, the Bureau of Indian Affairs overtook, by armed force, the Tribal offices and maliciously interfered with the performance of official duties of the Presidency and the duties of the members of the Election Board, and

Whereas, Edward Driving Hawk illegally swore-in [sic], prior to their certification, new members of the Tribal Council and began conducting an illegal council meeting whereby all members of the present Tribal Election Board were dissolved and a new Tribal Election Board was appointed;

Now therefore be it resolved, that the Rosebud Sioux Tribal Council is of the consensus that a full investigation is imperative into said election and into the attempted overthrow of the Rosebud Sioux Tribal government by the Bureau of Indian Affairs and Edward Driving Hawk and his supporters and the Council hereby assumes and authorizes a full investigation into the general election for said purposes, and

Be it further resolved, that the President of the Rosebud Sioux Tribe is hereby authorized and directed to coordinate said investigation on behalf of the Rosebud Sioux Tribal Council (Mr. Burnette, Mr. Driving Hawk's principal adversary is the incumbent President.)

The Tribal Election Board similarly has made an express finding on the merits of the alleged election irregularities without affording Mr. Driving Hawk or his supporters notice or an opportunity to be heard. See letter to Mr. Robert Burnette, October 31, 1975, from the Rosebud Sioux Tribal Election Board. Furthermore, the Tribal Election Board in submitting its recommendations to the existing Tribal Council and the Tribal Council in passing of Resolution 75–126 calling for a special re-election "because of fraud and other flagrant election violations," have ignored the requirements of the Tribal election statute that vest the decision for a re-election in the "incoming" Tribal Council. Ord.No. 75--05 § 24.

With both the Tribal Council and the Tribal Election Board having gone on

---

to repeatedly as the appropriate place for a complete resolution of the controversy by advocates who sought to return the controversy to Tribal procedures.

**12.** Robert Burnette later issued a report to the Rosebud Sioux people under the signature of the Rosebud Sioux Tribe charging Mr. Driving Hawk with various illegal acts.

public record with statements reference the merits of the controversy without affording Mr. Driving Hawk an opportunity to speak and present evidence on his behalf, to now force Mr. Driving Hawk to seek a hearing on his complaints before either or both of these parties would be nothing short of an exercise in futility, and would make a mockery of the concept of due process. Exhaustion is not required if the evidence conclusively, as the Court finds it does, indicates that the outcome of the alternative proceedings has been prejudicially predetermined so as to make exhaustion futile and inappropriate. *Cf. Morgan v. La-Vallee,* 526 F.2d 221 (2d Cir. 1975); *U. S. ex rel. Condon v. Erickson,* 459 F.2d 663, 667 (8th Cir. 1972); *Lewis v. New Mexico,* 423 F.2d 1048, 1049 (10th Cir. 1970).

This Court, after having taken evidence introduced by the principal parties found, pursuant to Rule 53 of the Federal Rules of Civil Procedure that this case was an appropriate one for the appointment of a Special Master to hear the election contests in order to determine the validity of the counterclaimants' allegations. The Court accordingly did appoint by order of November 28, 1975, Ben Reifel, a man familiar with the Rosebud Reservation, well respected by all concerned parties and born of the Indian people to sit as said Special Master. Simultaneously therewith the Election Board was ordered to count the ballots and certify the results in accordance with Ordinance No. 75–05 § 12(J).[13] All parties desirous of contesting the election were required to file their complaints with the special Master within three days of certification by the Election Board. The Master, after taking an exhaustive amount of testimony made findings of fact and issued the following recommendations to the Court:

1. No new election be held.
2. That the certification of election results to Norman L. Knox, Secretary, Rosebud Sioux Tribe, from the Rosebud Sioux Tribal Election Board dated November 28, 1975  .   .   . stand as the authority of the Tribal Secretary to issue a certificate of election to each duly qualified candidate as prescribed on page 7 Section 12J of Election Ordinance RB 75–05

.   .   .

Objections to the Master's report have been filed alleging that the Master's findings were clearly erroneous,[14] and further that the Master was biased. This Court thereafter granted a full hearing to any and all parties so requesting and after taking additional evidence of all matters not heard by the Master concludes that the report's findings of fact will be and are accepted in their entirety and the Master's recommendation will be modified only slightly by factual findings on disputes which the Master expressly reserved to the Court. The record in this cause reveals that the Master carried out his difficult function with patience and concern for the participating parties and a sincere search for the truth. Indeed, to the end that all witnesses had a full opportunity to testify in a frank and full manner, where

13. That section reads as follows:

Certification of Election. The Tribal Election Board, upon return of the ballot boxes and voting results from the communities, shall post the results of the election in public. The Board shall certify the results of the election to the Tribal Secretary in not more than three (3) days, including Saturdays, Sundays and holidays, after the election. The Tribal Secretary shall issue a Certificate of Election to each duly elected candidate on the form attached hereto after all contests and decisions are made by the Tribal Election Board.

14. The plaintiffs have also objected to the Special Master's report on the grounds that it was not filed and noticed pursuant to Rule 53(e) of the Federal Rules of Civil Procedure. All parties to the controversy secured a copy of the Master's report and the transcript as soon as same was made available although it was later formally filed with the Clerk's office. The Master filed the original report with the presiding judge. Copies were delivered to all counsel of record and all parties had same available to them and were given ample opportunity to file their objections and indeed all objections and evidence in support thereof were considered by the Court during hearings conducted on January 7 and 8, 1976.

appropriate, the Master resorted to the use of the tribal language. Any suggestion that the Master was derelict in his duty or in any manner exhibited a bias in favor of any of the parties is rejected.

■ The Master however did not rule on two troublesome questions; the existence of spoiled ballots and the problem of alleged ineligible voters participating in the election.[15] The evidence discloses that there were thirty-one ballots that had been marked "spoiled" by the community election judges and placed in separate envelopes. Excepting one instance the validity of the local judges' decisions with respect to these ballots were not ruled on by the Master or the Tribal Election Board. That exception involved the Two-Strike Community and involved one ballot which the Tribal Election Board during the Court ordered count determined to be valid and hence was counted. Unfortunately that ballot was thereafter intermingled with the other ballots and not available for the Court's perusal. Although a "spoiled ballot" is clearly defined in the election code, Ord.No. 75–05 Sec. 20(G), it is clear that in common practice, with slight exception, that definition was ignored.[16] The local election judges, with some exceptions, and consistent with their past procedures, exercised the authority to consider each alleged "spoiled ballot" and included it in the vote count if the ballot clearly manifested the intent of its voter and was not illegally marked (i. e., for too many candidates) and to exclude it if not so manifested. Hence, a substantial

majority of the so-called "spoiled ballots" were those interpreted as improperly marked and excluded from the vote count.

The evidence discloses however that at least one of the eleven "spoiled ballots" in the Antelope Community and unspecified numbers of ballots in other communities were properly dealt with pursuant to the appropriate definition and requirements of the ordinance. In those instances prior to such ballot being placed in the ballot box by the voter, the voter was given a substitute ballot with which to vote. In short, the term "spoiled ballot" was interpreted appropriately to refer to those ballots improperly marked but so recognized prior to being deposited in the ballot box. In those cases in which the Election Board under their usual procedures validated and counted same, prejudice to the certified vote count may well have resulted. In those instances in which the ordinance was adhered to, the ballot of course was not counted and no prejudice could result for such a ballot would never have reached the ballot box and the voter received a fresh ballot. As the Court has previously stated, there were thirty-one so called "spoiled ballots" in issue. Assuming therefore that all of said ballots clearly manifest the intention of the voter and were hence deemed to be countable, mathematical calculations reveal that they potentially affect the results of the count in only two local community races for Tribal Council seats. In one of those communities, Two-Strike, the one allegedly spoiled ballot counted as valid by

**15.** The Master also reserved for this Court allegations of a general scheme of fraudulent and illegal activities on the part of the defendants. While it is recognized that Mr. Driving Hawk acted inappropriately in attempting to assume the office of presidency prematurely, (see note 2, supra), the Court finds that his indiscretions in no manner affect the validity of the vote count. Tribal Ordinance Section 26 reads as follows:

This Ordinance is intended to establish procedures to insure fair elections. This Ordinance shall be interpreted liberally to accomplish such intent. Substantial complaints shall satisfy this Ordinance. Technicalities shall not

be used to interfere, delay or block elections, or to cause confusion, or the loss of confidence in the election system.

**16.** Section 20(G) reads as follows:

Spoiled Ballots. Any voter who spoils his or her ballot shall be entitled to a new ballot upon surrender of the spoiled ballot to the election judge. No voter shall receive more than one additional ballot. Each spoiled ballot shall be kept in a separate envelope securely sealed and marked "SPOILED BALLOT," with the name of the voter on the envelope and the envelope initialed by an election judge. All spoiled ballots shall be accounted for, separately on a tally sheet.

the election board creating a tie vote, was inadvertently commingled with the other ballots. It's validity is subject to conflicting interpretations, and the Court is unable to identify it. Under such circumstances the ballot must be presumed to prejudice the election, and a special election is necessary and will be ordered in accordance with Ord.No. 75–05 § 7. The other affected community, Antelope, has eleven spoiled ballots that may affect the results in the Tribal Council seat race. In the interests of justice it is required and it will be ordered that consistent with the intent of Tribal procedures, the newly elected Tribal Council, sitting without the representatives of Antelope Community, re-examine the Antelope ballot box and rule on whether the eleven spoiled ballots can and should be appropriately counted. The vote will be altered according to the findings of the Tribal Council unless (1) the spoiled ballots have been commingled with the valid ballots (2) the altered count has a candidate qualifying for office by one vote [17] or (3) there is a tie vote for the last Council seat, whereupon a special election for all the Tribal Council seats in Antelope Community will be ordered.[18]

■ Finally the Court must consider the allegation that 92 unenrolled persons illegally voted in the election. While the evidence indicates that a substantial number of these allegedly unenrolled persons were, in fact, legally registered voters, the Court need not rest its hereinafter stated conclusion on that ground. The Tribal election ordinance, 75–05,

Secs. 21–22, provides for the challenge of voters at the polls by any member of the Election Board, any member of the Community Election Committee, or a watcher for any candidate. In the event of a challenge, the person so challenged is permitted to vote, his or her vote sealed and the challenge is later heard by the Election Board prior to counting the challenged vote or votes if it or they could significantly affect the election results. Furthermore, all voters must be listed in an official registration sheet distributed prior to the election by the Tribal Election Board to the local election judges. If one seeking to vote is not so listed he or she may sign an affidavit of residency and thereupon receive a ballot. Such a procedure in no way precludes a challenge to that person's right to vote. The procedure for the challenging of alleged unqualified voters was obviously designed to insure that all concerned parties were given free and unfettered rights to challenge. Furthermore, the procedures are designed to the end that any challenge be promptly made to local election judges who know the people of their respective communities and who can record their ultimate conclusions on the validity of any challenge. A principal purpose for these procedures was and is to prevent election manipulation by unscrupulous candidates, and/or their supporters. To permit a candidate, after determining that he or she has lost the election, to produce records of people that allegedly voted improperly and to contest the results to the end that a new election be held would be to force the Election Board to

---

**17.** The evidence indicates that one of the ballots was marked by an election official as "spoiled" before it was deposited in the ballot box, and the voter was given a new ballot with which to vote. Since it is uncertain which "spoiled" ballot was so marked, and it should not be counted under any circumstances, if any "spoiled" ballots are deemed to be valid and added to the vote count there is, under certain circumstances, a possible error of one vote in the count.

Rather than hypothesize those circumstances, in the interests of clarity a broader rule will be adopted that invalidates the election if the

winner of the last councilmanic seat in the community is decided by a one vote margin.

**18.** *Cf.* Ordinance 75–05:

In the event of a tie vote in a primary election among more than two candidates receiving the highest number of votes for the same office, all tied candidates shall be candidates in the general election. In the event of a tie for the high vote in a general election, a special election shall be called limited to the tied candidates. The incumbent shall continue to hold office until the newly elected candidate takes the oath of office.

make difficult after the fact decisions on voter identification and registration. To sanction such procedures would open the door to conduct of the most unscrupulous nature. Indeed, in the extreme case, unqualified voters could be encouraged to vote to the end that a new election could be demanded by one who anticipates defeat. To protect against such a potential hazard, provisions were made to the end that all challenges had to be made at the polls. Late challenges, as are alleged in the instant situation, are untimely and, therefore, inappropriate.

In conclusion, the Court finds that the evidence preponderates that the October 23, 1975 election was fairly conducted and valid, and that the count made and certified by the Tribal Election Board on November 28, 1975 be and the same is deemed to be the final count with the exception of the results involving the contest for Tribal Council seats in the Two-Strike and Antelope Communities as heretofore stated.

An appropriate Order will issue.